## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

SYLVESTER KELLY,                          )
                                          )
                    Plaintiff,            )
v.                                        )          **Civil Action No. 1:15-04914**
                                          )
UNITED STATES OF AMERICA, *et al.*,       )
                                          )
                    Defendants.           )

### PROPOSED FINDINGS AND RECOMMENDATION

Pending before the Court are the following Motions: (1) Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Document No. 26), filed on July 17, 2015; (2) Plaintiff's "Motion for Restraining Order Against Medical Staff" (Document Nos. 36 and 37), filed on September 8, 2015, and September 14, 2015; and (3) Plaintiff's letter-form "Motion for Temporary Restraining Order or Preliminary Injunction" (Document No. 43), filed on October 22, 2015. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to Defendants' Motions and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the Defendants. (Document No. 29.) On October 26, 2015, Plaintiff filed his Response in Opposition to Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment." (Document Nos. 45 and 46.)

### PROCEDURAL AND FACTUAL BACKGROUND

On April 17, 2015, Plaintiff filed an Application to Proceed Without Prepayment of Fees and Complaint seeking relief pursuant to the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, and for alleged violations of his constitutional and civil rights

pursuant to <u>Bivens v. Six Unknown Federal Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619 (1971). (Document Nos. 1 and 2.) In his Complaint, Plaintiff names the following as defendants: (1) United States of America; (2) Karen F. Hogsten, Warden; (3) D. Friss, Associate Warden; (4) William Goode, Physician Assistant; (5) Ashley Stark, Physician Assistant; (6) Ms. Kelly Lucas, Health Services Administrator; and (6) H. Matos, Doctor. (Document No. 2, pp. 2 - 3.) Plaintiff alleges that Defendants acted with negligence and deliberate indifference in diagnosing and providing treatment for his Helicobacter Pylori ["H. pylori"].[1] (<u>Id.</u>, pp. 6 - 10.) Plaintiff alleges that on February 8, 2013, he "first suffered from extreme chest pains, nausea, and dizziness, which derived from a stomach bacterium infection call H. pylori." (<u>Id.</u>, p. 6.) Plaintiff complains that "[t]his stomach bacterium infection went mis-diagnosis/non-diagnosed several times over the course of the 2013 calender year by the F.C.I. McDowell staff, nurses, and physicians assistants." (<u>Id.</u>) Plaintiff alleges that he sought treatment numerous times in 2013, but he was "constantly turned away." (<u>Id.</u>) Plaintiff asserts that he notified Defendant Lucas, Hogsten, and Friss by e-mail that "he was being denied medical treatment concerning ongoing chest pain." (<u>Id.</u>) Thus, Plaintiff contends that "the administration had actual knowledge that there were deficiencies in the medical care system that created a risk of the kind of harm that happened to Plaintiff." (<u>Id.</u>)

Plaintiff alleges that he informed Defendant Lucas he was being denied medical treatment and that Dr. Matos was refusing to properly supervise his staff concerning Plaintiff's treatment. (<u>Id.</u>, p. 7.) Plaintiff contends that Defendant Lucas "turned a blind eye to Plaintiff's

---

[1]   Because Plaintiff is acting *pro se*, the documents which he has filed are held to a less stringent standard than if they were prepared by a lawyer and therefore construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

concerns" and "constantly refused to become involved, and after Plaintiff's numerous sick-call visits, she refused to have him seen and treated." (Id.)

Plaintiff claims that Defendant Matos "failed to supervise his medical personnel on the proper procedures as to how to administer an effective response in providing adequate triage to combat the serious illness that Plaintiff was suffering." (Id.) Although Defendant Matos was aware of Plaintiff's medical complaints, Plaintiff alleges that Defendant Matos determined "nothing was wrong," refused to provide Plaintiff with stool sample testing, and refused to thoroughly exam Plaintiff. (Id.)

Plaintiff asserts that Defendant Goode's act of delaying or refusing to examine Plaintiff during sick-call visits caused Plaintiff to suffer unnecessary and prolonged pain. (Id.) Plaintiff explains that Defendant Goode "prescribed Plaintiff inappropriate medication (Amoxicillin) for epigastric pain and bloating with diarrhea without conducting diagnostic testing or a complete and thorough examination." (Id.) Therefore, Plaintiff states that Defendant Goode "failed in his duty and responsibility to utilize ordinary knowledge, skill, and care to figure out Plaintiff's illness." (Id.)

Plaintiff contends that Defendant Stark delayed discovery and treatment of Plaintiff's H. pylori for 30 days, which caused unnecessary and prolonged pain and suffering. (Id., p. 8.) Plaintiff explains even though Defendant Stark conducted a blood test on January 8, 2014, she failed to review the test results which revealed that Plaintiff was positive for H. pylori. (Id.) Plaintiff alleges that he reported to sick-call on February 7, 2014, but Defendant Stark "refused to see Plaintiff and sent Nurse N. Dufour to inform Plaintiff that 'nothing is wrong with him.'" (Id.) Plaintiff asserts that he requested a copy of the results from his blood test conducted on

January 8, 2014, which revealed he was positive for H. pylori. (Id.) Plaintiff explains that he "reported this positive result of H. pylori to Nurse N. Dufour, who took Plaintiff's documented medical blood test results to Defendant Ashley Stark." (Id.) Plaintiff alleges that Defendant Stark "then called Plaintiff into her office and informed him that he was positive for H. pylori, and further stated 'this is the cause of your chest pains.'" (Id.) Plaintiff, therefore, argues that Defendant Stark "failed to exercise ordinary knowledge, skill, and care to figure out Plaintiff's pain, suffering, and illness." (Id.)

Plaintiff complains that Defendant Hogsten "turned a blind eye to the neglect that was taking place with the denial of Plaintiff's medical treatment." (Id.) Plaintiff explains that even though he notified Defendant Hogsten that he was not receiving adequate medical care, Defendant Hogsten refused to investigate and respond to Plaintiff's pleas for help. (Id.) Plaintiff further states that Defendant Hogsten "failed in her duty and responsibility as Chief Administrator to properly supervise her staff/employees." (Id.)

Plaintiff claims that Defendant Friss "failed to get involved with having Plaintiff seen and treated." (Id., p. 9.) Plaintiff explains that even though he notified Defendant Friss that he was being denied adequate medical treatment, Defendant Friss merely responded that "we can't find anything wrong with you, we will just have to push your care level up and get you out of here." (Id.) Plaintiff, therefore, states that Defendant Friss "acted with negligence and omission by treating Plaintiff's medical condition in a careless manner." (Id.)

Based on the foregoing, Plaintiff claims that each of the named Defendants "acted with deliberate indifference, recklessness, medical malpractice, and actual malice (intent to cause harm) by denying adequate medical care." (Id.) As a result of Defendants' conduct, Plaintiff

states that he is "left with feeling the effects of the bacterium infection (H. pylori)" and "continues to suffer from headaches, stomach pains, pain in passing stool, diarrhea, low back pains, ulcers, depression, and gastrointestinal reflux disease." (Id.) Plaintiff requests monetary relief. (Id., p. 11.)

As Exhibits, Plaintiff attaches the following: (1) A copy of a "List of Sick Call Dates" (Document No. 2-1, pp. 1 - 2.); (2) A copy of Plaintiff's "Request for Administrative Remedy Informal Resolution Form" dated June 17, 2013 (Id., pp. 4 - 5.); (2) A copy of Plaintiff's "Request for Administrative Remedy" dated June 25, 2013 (Remedy No. 740837-F1) (Id., p. 6.); (3) A copy of Warden Karen F. Hogsten's Response dated July 17, 2013 (Remedy No. 740837-F1) (Id., p. 7.); (4) A copy of Plaintiff's "Regional Administrative Remedy Appeal" (Id., pp. 8 - 9.); (5) A copy of Regional Director C. Eichenlaub's response denying Plaintiff's appeal dated August 7, 2013 (Remedy No. 740837-R1) (Id., p. 10.); (6) A copy of Plaintiff's "Central Office Administrative Remedy Appeal" dated August 28, 2013 (Id., p. 12.); (7) A copy of Acting Administrator of National Inmate Appeals' Response dated October 21, 2014 (Id., p. 13.); (8) A copy of Plaintiff's Standard Form 95 "Claim for Damage, Injury, or Death" dated January 12, 2015 (Id., pp. 14 - 16, 18 - 19.); (9) A copy of an e-mail from Joseph Zimmerman directed to Marc Reiner regarding the "Congressional Injury Response - - Sylvester Kelly" (Id., p. 17.); (10) A copy of a letter dated January 21, 2015, from the BOP acknowledging receipt of Plaintiff's Administrative Claim Number TRT-MXR-2015-01854 (Id., p. 20.); (11) A copy of a letter dated February 19, 2015, from the BOP denying Plaintiff's Administrative Claim Number TRT-MXR-2015-01854 (Id., pp. 21 - 22.); (12) A copy of Plaintiff's e-mail correspondences with the FCI McDowell Administration (Id., pp. 23 - 32.); (13) A copy of an e-mail containing

5

an OSHA new release (Id., p. 34.); and (14) A copy of an article entitled "Feds: W.Va. Prison had 10 serious safety issues" from The Charleston Gazette, dated August 13, 2014 (Id.,35.).

By Order entered on April 21, 2015, the undersigned granted Plaintiff's Application to Proceed Without Prepayment of Fees and ordered the Clerk to issue process upon Defendants upon receipt of Plaintiff's initial partial payment of the filing fee. (Document No. 7.) Plaintiff paid his initial partial payment of the filing fee on May 14, 2015, and the Clerk issued process. (Document Nos. 11 - 12.)

On July 17, 2015, Defendants filed a "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment" and Memorandum in Support. (Document Nos. 26 - 27.) Concerning Plaintiff's Bivens claim, Defendants argue that his claims should be dismissed based on the following: (1) Plaintiff cannot establish a constitutional violation (Document No. 27, pp. 10 - 14.); (2) Defendants are entitled to qualified immunity (Id., pp. 14 - 16.); (3) Vicarious liability is inapplicable (Id., pp. 16 - 17.); and (4) "Defendant Lucas is a U.S. Public Health Service Employee and is therefore entitled to absolute immunity" (Id., pp. 17 - 18.). Concerning Plaintiff's FTCA claim, the United States argues that his claim should be dismissed based on the following: (1) "Plaintiff's negligence claim against the United States must be dismissed for failure to comply with the West Virginia Medical Professional Liability Act (Id., pp. 18 - 22.); and (2) "Plaintiff's negligence claim against the United States is without merit and must be dismissed (Id., pp. 22 - 23.) Finally, Defendants argue that "Plaintiff's claim for emotional or psychological damages must be dismissed due to the lack of physical injury." (Id., pp. 23 - 24.)

As Exhibits, Defendants attach a copy of the following: (1) The Declaration of Sharon Wahl (Document No. 26-1, pp. 1 -2.); (2) Plaintiff's Administrate Tort Claim dated January 12,

6

2005, and supporting Exhibits (Id., pp. 4 - 37); (3) The Tort Claim Denial Letter dated February 19, 2015 (Id., pp. 38 - 39.); (4) The Declaration of Ashley Stark (Document No. 26-2, pp. 1 - 5.); (5) Plaintiff's medical records from FCI McDowell (Id., pp. 6 - 104, Document No. 26-3, and Document No. 26-4.); (6) The Declaration of Karen Hogsten (Document No. 26-5.); (7) The Declaration of Glenn Friss (Document No. 26-6.); and (8) The Declaration of Kelly Lucas (Document No. 26-7.).

Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on July 20, 2015, advising him of the right to file a response to the Defendants' Motion. (Document No. 29.)

On September 5, 2015, Plaintiff filed a "Motion Requesting Restraining Order Against Medical Staff." (Document No. 36.) Plaintiff alleges that on September 2, 2015, he was placed in the Special Housing Unit ["SHU"] "in retaliation for requesting medical records concerning infectious diseases." (Id.) Plaintiff further contends that his is being retaliated against by "Administration and Health Services Staff with falsified incident reports, harassment, cell searches, and destroying personal property." (Id.) Finally, Plaintiff alleges that "Counsel M. Mercado threaten Plaintiff with SHU if Plaintiff continued to pursue a Bivens action against staff." (Id.) As Exhibits, Plaintiff attaches the following: (1) A copy of his "Inmate Request to Staff" dated September 2, 2015 (Id., p. 3.); and (2) A copy of his Incident Report dated September 2, 2015, charging Plaintiff with "Refusing to Obey an Order of any Staff Member" in violation of Prohibited Act Code 307 (Id., p. 4.).

On September 14, 2015, Plaintiff filed his letter-form Motion for a Restraining Order against FCI McDowell's medical staff, A. Stamper, A. Stark, Kelly Lucas, N. Dufour, and

William Goode. (Document No. 37.) Plaintiff continues to argue that he was placed in SHU "due to the Administration retaliating against [him] for requesting medical records." (Id.) Plaintiff, therefore, requests the Court "enter an order for a restraining order against the above staff and have him moved from this institution." (Id.)

On October 22, 2015, Plaintiff filed his letter-form "Motion for Temporary Restraining Order and/or in the alternative, Preliminary Injunction pending the final judgment in this action." (Document No. 43.) Plaintiff alleges that "because of the above-action and many complaints, Defendants have removed all filtered protected water fountains in retaliation." (Id.) Plaintiff, therefore, requests that "the Defendants be ordered to return the fountains or provide bottled water each meal at the institution." (Id.)

On October 26, 2015, Plaintiff filed his Response in Opposition to Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" and Declaration in support. (Document Nos. 45 and 46.) As Exhibits, Plaintiff attaches the following: (1) A copy an Incident Report dated May 1, 2014, charging Plaintiff with Refusing to Obey An Order of Any Staff Member, Interfering with Staff in Performance of Duties, Conduct which Disrupts or Interferes with Security or Orderly Running of a BOP Facility in violation of Prohibited Act Code Section 307, 398, and 399 (Document No. 46, p. 8.) (2) A copy of Plaintiff's "Regional Administrative Remedy Appeal" dated January 22, 2015, regarding his claim of an inadequate law library (Id., p. 9.); (3) A copy of an EPA "Newsroom" article entitled "Welch, W. Va. Settles Clean Water Act Violations" (Id., pp. 10 - 11.) (4) A copy of an letter from the State of West Virginia Board of Medicine dated October 1, 2015, stating that PA Ashley Stark is a licensee of Virginia (Id., p. 12.); (5) A copy of the "Inmate Admission & Orientation Handbook" (Id., pp. 13 - 18.); (6) A

copy of the Warden B.J. Johnson's Memorandum concerning the removal for water fountains and the testing of drinking water (Id., p. 19.); (7) The Declaration of Inmate Charles Allen and supporting medical records (Id., pp. 20 - 27.); (8) The Declaration of Inmate Joshua Ewing (Id., pp. 28 - 29.); (9) The Declaration of Inmate Daniel Keith Gilliam (Id., pp. 30 - 31.); (10) The Declaration of Inmate Ramon F. Flores (Id., p. 32 - 33.); (11) The Declaration of Inmate Joshua Kitt (Id., pp. 34 - 35.); (12) The Declaration of Inmate Shawn Dorsey (Id., pp. 36 - 37.); (13) The Declaration of Inmate Ronald E. Adams (Id., p. 38.); and (14) The Declaration of Inmate Juan Vasquez (Id., p. 39.).[2]

## FACTUAL HISTORY

Based upon a review of Plaintiff's medical records, Plaintiff arrived at FCI McDowell on November 30, 2011, and was evaluated by Physician Assistant ["PA"] William Goode. (Document No. 26-2, pp. 44 - 48.) During his evaluation, Plaintiff only complained of pain in his "left great toenail." (Id.) PA Goode diagnosed Plaintiff with cellulitis and an abscess. (Id., p. 47.) Plaintiff was prescribed ibuprofen and sulfamenthoxazole. (Id.) By Administrative Note entered on December 5, 2011, Dr. H. Matos noted that Plaintiff was discontinued from the GI Clinic because "he has no symptoms of reflux and he states that he never took medication to treat such condition." (Id., p. 43.) Plaintiff was instructed to contact Health Services if any symptom arises in the future. (Id.) On January 4, 2012, PA Carl Hill noted that Plaintiff was a "no show" for his

---

[2] The undersigned notes that the Declarations submitted by the foregoing inmates state they contracted H. pylori and received inadequate medical care while at FCI McDowell. Unsupported affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient. *Moore v. United States*, 1987 WL 11280 (S.D.W.Va. March 23, 1987); *also see Evans v. Technologies Applications & Service, Co.*, 80 F.3d 954, 692 (4th Cir. 1996). The undersigned further notes that the Declarations relate to each inmate's personal experience. Thus, the Declarations do not support a finding or conclusion regarding treatment provided to Plaintiff.

sick call appointment regarding a knot in the genital area, an ingrown toenail, and chest pain. (Id., pp. 39 - 42.) On January 27, 2012, MLP Elizabeth Panaguiton removed Plaintiff's ingrown toenail. (Id., pp. 35 - 37.) On February 7, 2012, Plaintiff reported to sick call complaining of "recurrent rectal pain unrelated to bowel movement for 2 to 3 years" and "recurrent left side chest pain, unrelated to activity." (Id., pp. 32 - 34.) Plaintiff denied any changes in bowel habits and admitted discomfort with urination. (Id. p. 32.) Plaintiff was examined by PA Hill, who noted that Plaintiff had a regular rate and rhythm, normal active bowel sounds, and abdomen was soft and non-tender. (Id., p. 33.) PA Hill ordered lab tests and an EKG. (Id., pp. 33 - 34.) The EKG was conducted on February 22, 2012, which revealed normal results except for rate. (Document No. 26-3, p. 8.)

On March 6, 2012, Plaintiff reported to Health Services complaining of "right abdominal flank pain" for one month. (Document No. 26-2, pp. 29 - 31.) PA Hill evaluated Plaintiff nothing that Plaintiff had normal active bowel sounds and his abdomen was non-tender on palpation. (Id., p. 30.) An abdominal x-ray was ordered and Plaintiff was advised to follow-up immediately if his condition worsened. (Id., pp. 30 - 31.) The x-ray was conducted on March 15, 2012, and revealed negative results except possible constipation without no evidence of an obstruction. (Document No. 26-3, p. 10.) On March 23, 2012, Plaintiff reported to sick call for follow-up on the removal of his ingrown toenail. (Document No. 26-2, pp. 28 - 29.) Plaintiff was examined by PA Hill, who noted that the ingrown toenail had irregular edges, but was improved with no swelling. (Id., p. 28.) On April 17, 2012, Plaintiff reported to sick call complaining of chronic foot pain for more than two years and for follow-up on his lab work for abdominal pain. (Id., pp. 22 - 23.) PA Hill evaluated Plaintiff noting that he had bilateral flat feet. (Id., p. 23.) PA Hill

ordered x-rays of Plaintiff's feet and directed Plaintiff to try arch supports. (Id., p. 24.)

On May 31, 2012, Plaintiff reported to Health Services complaining of recurrent chest pain when working out and playing handball. (Id., pp. 19 - 21.) PA Hill examined Plaintiff noting that Plaintiff's heart had a regular rhythm and his symptoms were consistent with muscle strain. (Id., p. 21.) PA Hill ordered lab tests and advised Plaintiff to follow-up at sick call if his symptoms worsened. (Id.) On June 11, 2012, Plaintiff's lab tests revealed normal results. (Id., pp. 67 and 101.) Plaintiff reported to Health Services on June 12, 2012, for an Injury Assessment after spilling hot coffee on his left hand. (Id., pp. 15 - 17.) PA Goode examined Plaintiff, prescribed silver sulfadiazine cream, and instructed Plaintiff on wound care. (Id.) Plaintiff failed to report for his sick call visit on August 28, 2012, concerning his complaints of continually feeling faint, having chest pain, head pain, blurred vision, and discomfort in urine flow. (Id., pp. 13 - 14.) On October 18, 2012, Plaintiff reported to sick call complaining of feeling faint, blurred vision, and chest pain. (Id., pp. 7 - 10.) Plaintiff was evaluated by MLP Panaguiton, who noted that Plaintiff's heart was bradycardic with skipped beats. (Id., pp. 9 - 10.) MLP Panaguiton ordered lab testing, including a blood test of H-Pylori, and an EKG. (Id.) Lab testing preformed on October 31, 2012, revealed negative results of H. pylori. (Id., p. 88.) The EKG was performed on November 1, 2012, and revealed normal results except for rate. (Id., pp. 6 and 90.) Lab testing was also collected on November 1, 2012, which was normal. (Id., p. 86.)

On January 25, 2013, the Utilization Review Committee denied Dr. Mato's request for Plaintiff be referred to a cardiologist. (Document No. 26-3, p. 69.) On February 8, 2013, March 14, 2013, April 4, 2013, May 14, 2013, and June 6, 2013, Plaintiff either refused to be seen or was a "no show" for sick call appointments for complaints of chest pain. (Id., pp. 34 - 40.) A RN

performed an EKG on April 9, 2013, which was borderline normal. (<u>Id.</u>, pp. 65 - 66.) On July 22, 2013, Plaintiff reported to Health Services complaining of chest pain without shortness of breath. (<u>Id.</u>, pp. 30 - 32.) Plaintiff advised that he had no problem doing push-ups and running. (<u>Id.</u>) Plaintiff was evaluated by MLP Panaguiton, who noted that Plaintiff's heart had a regular rate and rhythm. (<u>Id.</u>, p. 31.) MLP Panagution issued Plaintiff a medical idle and scheduled a follow-up appointment with the Clinical Director. (<u>Id.</u>, p. 31.) The next day, on July 23, 2013, Plaintiff was evaluated by Dr. Matos. (<u>Id.</u>, pp. 27 - 29.) Dr. Matos ordered a chest x-ray and EKG. (<u>Id.</u>) The chest x-ray was conducted on July 29, 2013, and revealed negative findings. (<u>Id.</u>, p. 62.) The EKG was performed on July 30, 2013, which revealed normal results except for rate. (<u>Id.</u>, p. 58.)

On August 1, 2013, Plaintiff presented to sick call complaining of an ear ache, epigastric pain, and bloating with diarrhea for three days. (<u>Id.</u>, p. 24.) PA Goode examined Plaintiff and diagnosed him with acid reflux and an acute ear infection. (<u>Id.</u>, p. 25.) PA Goode prescribed Amoxicillin as treatment for Plaintiff's ear infection and instructed Plaintiff to purchase over-the-counter omeprazole for his acid reflux. (<u>Id.</u>, pp. 25 - 26.) On December 26, 2013, Plaintiff reported to sick call complaining of chest pain associated shortness of breath, frontal headaches, low grade fevers, and blurred vision. (<u>Id.</u>, p. 113.) Plaintiff was evaluated by PA Ashley Stark, who ordered lab work and an EKG. (<u>Id.</u>, p. 116.) PA Stark further instructed Plaintiff to limit his intake of sodium and caffeine. (<u>Id.</u>, p. 117.)

Plaintiff's lab tests were conducted on January 8, 2014, revealing that he was positive for H. pylori. (Document No. 26-4, pp. 35 - 36.) Plaintiff's EKG was conduct on the same day, revealing normal results. (<u>Id.</u>, pp. 8 and 32.) On February 7, 2014, Plaintiff reported to Health

Services where his lab results were discussed with him. (Document No. 26-3, pp. 110 - 112.) PA Stark prescribed a 14-day regimen of medication to treat H. pylori and explained the importance of completing the full 14-day course. (Id.) PA Stark again educated Plaintiff on a proper diet and instructed him to purchase Zantac or Omeprzole from the commissary. (Id.) On March 21, 2014, Plaintiff reported to sick call complaining of abdominal pain and upset stomach. (Id., pp. 107 - 109.) Plaintiff described his aching pain in the epigastric area most bothersome right after eating and resolves within an hour. (Id., p. 107.) Plaintiff stated that his bowel movements are normal, no diarrhea, no blood in stool, no vomiting, no chest pain. (Id.) Plaintiff stated that he avoids pork, red mean, and foods in high sugar. (Id.) Plaintiff, however, acknowledged that he does drink coffee daily in the mornings and sleeps through breakfast. (Id.) Plaintiff was examined by PA Stark. (Id., pp. 107 - 108.) PA Stark scheduled Plaintiff for a follow-up urea breath test for H. pylori. (Id., p. 109.) PA Stark explained to Plaintiff the cause of H. pylori, advised him to wash his hands frequently before meals, emphasized the importance of dietary changes, and advised him to avoid ibuprofen and drink plenty of water. (Id.)

On March 27, 2014, Plaintiff returned to sick call complaining of stomach pain. (Id., p. 104.) RN Nicole Dufour examined Plaintiff noting normal bowel sounds. (Id.) RN Dufour instructed Plaintiff to purchase Zantac or Prilosec as previously ordered by PA Stark and to return to sick call if he did not notice a change or if his condition gets worse. (Id.) RN Dufour again educated Plaintiff on dietary changes. (Id.) On March 31, 2014, Plaintiff reported to sick call complaining of his stomach burning and stating that the over-the-counter medication had not helped his condition. (Document No. 101 - 102.) RN Goan, however, noted that the commissary sales report indicated that Plaintiff had not purchased the over-the-counter medication. (Id.) RN

Goan gave Plaintiff another medical commissary slip to purchase Zantac. (Id.) By Administrative Note entered on April 2, 2014, PA Stark indicated that "inmate has not purchased Zantac or Prilosec from commissary as of today." (Id., p. 100.) On May 1, 2014, Plaintiff reported to sick call again complaining of abdominal and stomach pain for months. (Id., pp. 98 - 99.) PA Stark again educated Plaintiff on proper food choices and instructed Plaintiff to purchase the over-the-counter medication. (Id.) Plaintiff, however, stated that "he would not purchase anything from the commissary to treat something 'we' gave him. (Id.) PA Stark explained to Plaintiff that the most common way H. pylori is transmitted is person to person (oral/oral, oral/fecal/ gastric/oral). (Id.) PA Stark noted that Plaintiff's commissary purchases revealed that he had not been obeying dietary restrictions. (Id.)

On May 23, 2014, Plaintiff reported to sick call complaining of nausea, bloody stool, abdominal pain, and chest pain. (Id., pp. 95 - 97.) Plaintiff was examined by PA Stark, who ordered lab tests and an EKG. (Id.) Plaintiff was also given Hemoccult cards to check for blood in his stool. (Id., p. 96) The EKG was performed that day and revealed normal results. (Id. and Document No. 26-4, p. 25.) PA Stark reviewed Plaintiff's commissary report, which revealed the purchase of the following: honey pepper turkey log, BBQ corn chips, hot & spicy veg, french vanilla cappuccino, and minced garlic. (Document No. 26-3, pp. 95 - 97.) PA Stark advised Plaintiff that all of the foregoing foods can irritate the stomach lining and cause additional acid, which causes symptoms of heartburn, epigastric pain in the chest area, and nausea. (Id.) PA Stark again instructed Plaintiff to purchase over-the-counter acid reflux medication from the commissary. (Id.)

On June 17, 2014, Plaintiff reported to Health Service for a follow-up concerning his

complaints of heartburn, abdominal pain, and nausea. (Document No. 26-3, pp.  92 - 93.) PA Stark noted that all of Plaintiff's Hemoccult cards were negative and the two separate QuickVue H. pylori gll tests were negative. (Id. and Document No. 26-4, p. 11.) PA Stark indicated that Plaintiff was shown the test results and acknowledged his understanding that he no longer had an active case of H. pylori. (Document No. 26-3, pp. 92 - 93.) PA Stark further noted that Plaintiff had not purchased Zantac from the commissary and again instructed Plaintiff to purchase the medication. (Id.) PA Stark again instructed Plaintiff to avoid spicy foods, caffeine, and other foods that irritate his stomach. (Id.)

On July 21, 2014, Plaintiff reported to sick call complaining of being lightheaded, dizzy, nausea, abdominal pain, and chest pain everyday for the past five months. (Id., pp. 90 - 92.) Plaintiff stated that he had purchased the Prilosec, but had not taken the medication regularly because he had been fasting. (Id.) PA Stark examined Plaintiff noting that his heart had a regular rate and rhythm, normal active bowel sounds, and his abdomen was soft and non-tender. (Id.) PA Stark explained to Plaintiff the need to eat at least three meals a day and to avoid spicy foods, caffeine, and irritating foods. (Id.) PA Stark again reviewed Plaintiff's recent commissary report, which revealed that Plaintiff had purchased the following: BBQ corn ships, diet Dr. Pepper, California cup soup, honey buns, chocolate chip cookies, chicken noodle maruchan, chili soup maruchan, cajan chicken soup, honey pepper turkey log, Reese peanut butter cups, and Snickers. (Id.) PA Stark advised Plaintiff that these are foods that he should avoid. (Id.) PA Stark again counseled Plaintiff on dietary choices and instructed him to take Prilosec once a day. (Id.)

On September 12, 2014, Plaintiff reported to Health Services complaining of continued abdominal and chest pain. (Id., pp. 85 - 88.) Plaintiff stated that his pain had no association to

food or activity, but hurt all the time. (<u>Id.</u>, p. 85.) Plaintiff claimed that he had been taking the Prilosec as instructed, but the medication was not helping. (<u>Id.</u>) Plaintiff was evaluated by PA Goode, who noted normal active bowl sounds, epigastric tenderness, and no abdominal guarding. (<u>Id.</u>) PA Goode noted that a review of Plaintiff's commissary report revealed the following purchases: honey pepper turkey log, BBQ corn chips, hot & spicy veg, french vanilla cappuccino, and minced garlic. (<u>Id.</u>) PA Goode advised Plaintiff that all of the foregoing goods could irritate the stomach lining, cause additional acid, heartburn, epigastric pain in the chest area, and nausea. (<u>Id.</u>) PA Goode prepared a consultation request for a referral to a gastroenterologist. (<u>Id.</u>, p. 87.) On the same day, Dr. Kenneth Gomez denied PA Goode request for a referral noting Plaintiff's unhealthy food choices and stating that "no matter what he takes for GERD, it will not work if he doesn't change his eating habits. (<u>Id.</u>, p. 84.)

On October 3, 2014, Plaintiff was a "no show" for his sick call appointment concerning his complaint of chest pain, stomach pain, and abdominal pain. (<u>Id.</u>, p. 83.) On October 23, 2014, Plaintiff reported to Health Services for complaints of chest and abdominal pain. (<u>Id.</u>, pp. 78 - 81.)  Lab work, an EKG, a chest x-ray, and an abdominal x-ray were performed on the same day. (<u>Id.</u>) The EKG and chest x-rays were normal. (Document No. 26-4, pp. 19 and 23.) The abdominal x-ray was normal with the exception of a large amount of stool. (<u>Id.</u>, p. 21.)

On October 30, 2014, Plaintiff reported to Health Service concerning his complaint of chronic left upper abdominal and left side pain. (<u>Id.</u>, pp. 74 - 77.) Plaintiff denied any relation to food or activity. (<u>Id.</u>, p. 74.) Plaintiff further denied chest pain, shortness of breath, vomiting, diarrhea, or change in bowel habits. (<u>Id.</u>) PA Goode evaluated Plaintiff noting normal active bowel sounds and no abdominal guarding or rigidity. (<u>Id.</u>, p. 76.) PA Goode ordered lab tests and

instructed Plaintiff to follow-up concerning his test results, and educated Plaintiff on his diet. (Id., p. 77.)

On December 30, 2014, Plaintiff reported to sick call complaining of abdominal pain, nausea, dizziness, and chest pain. (Document No. 26-4, pp. 52 - 54.) Plaintiff was examined by PA Stark who noted that Plaintiff had active bowel sounds and no abdominal guarding or tenderness. (Id., p. 53.) PA Stark reviewed Plaintiff's commissary report and noted that he still continued purchase foods he was advised not to consume. (Id., p. 54.) Two EKGs were performed, which revealed normal results. (Id., pp. 75 - 76.) PA Stark again educated Plaintiff as to his diet and instructed him to follow-up if his condition worsened. (Id., p. 54.) On January 22, 2015, Plaintiff was a "no show" for his sick call visit regarding his complaint of "feeling sick" and his request for a H. pylori stool test. (Id., p. 51.) On March 10, 2015, Plaintiff reported to sick call complaining of left lower side abdominal pain for two months, nausea, and vomiting. (Id., pp. 45 - .) PA was examined by PA Stark, who noted that Plaintiff had active bowel sounds and no abdominal guarding or tenderness. (Id., p. 46.) PA Stark ordered lab tests, a H pylori stool test, and abdominal x-rays. (Id., pp. 46 - 47.) Plaintiff's H. pylori stool test was conducted on March 19, 2015, and revealed negative results. (Id., p. 70.)

## THE STANDARD

### Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009)(quoting Bell Atlantic Corporation v. Twombly, 550 U.S. 554, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although factual allegations must be accepted as true for purposes of a motion to dismiss, this principle does not apply to legal conclusions. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Twombly, 550 U.S. at 555, 127 S.Ct. at 1959. Where a *pro se* Complaint can be remedied by an amendment, however, the District Court may not dismiss the Complaint with prejudice, but must permit the amendment. Denton v. Hernandez, 504 U.S. 25, 34, 112 S.Ct. 1728, 1734, 118 L.Ed.2d 340 (1992).

### Summary Judgment

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53.

Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate.

## DISCUSSION

1.      **Bivens Claim:**

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the violation of a valid constitutional right by a person acting under color of federal law.[3] The

---

[3] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional

United States Supreme Court has held that an inmate may name a federal officer in an individual

capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to

Bivens. See Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However,

Bivens claims are not actionable against the United States, federal agencies, or public officials

acting in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996,

127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991); Reinbold v. Evers,

187 F.3d 348, 355 n. 7 (4th Cir. 1999).

### A.     Defendant Lucas is entitled to absolute immunity.

In his Complaint, Plaintiff alleges that Defendant Lucas was aware that he was being

denied proper medical treatment for his claims of chest pain and "turned a blind eye to Plaintiff's

concerns." (Document No. 2.) Defendant Lucas argues that she is a United States Public Health

Service employee and therefore is entitled to absolute immunity. (Document No. 27, pp. 17 -

18.)  In support, Defendant Lucas attaches her Declaration stating as follows: "I am a

Commissioned Officer in the United States Public Health Service (PHS). (Document No. 35-3,

p. 53.)

---

rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens*
inmates may assert claims of personal liability against individual prison officials for violations of
their constitutional rights but may not assert claims against the government or prison officials in
their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at
1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court
found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.*
The Court noted that the legislative history of the FTCA "made it crystal clear that Congress
views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20,
100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of
relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*,
905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and
*Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions,
whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims
must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

In Response, Plaintiff argues that Defendant Lucas' Declaration should be rejected because it "is false and submitted under fraud." (Document No. 45, p. 6.) Specifically, Plaintiff disputes Defendant Lucas' statement that "I do not treat or make treatment decisions concerning inmates at the facility." (Id.) Plaintiff explains that "despite plaintiff's many unanswered e-mails to Lucas concerning complaints of treatment by McDowell's Health Services, on many occasions plaintiff personally confronted Lucas with his problem, and on at least one occasion, defendant Lucas got involved in treatment of plaintiff." (Id.)

> Title 42 U.S.C. § 233(a) provides as follows:
>
> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 . . . for damages for personal injury, including death, resulting from the performance of medical, surgical, dental or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee . . . whose act or omission gave rise to the claim.

Thus, Congress made proceedings under the Federal Tort Claims Act the sole avenue to seek relief against a Public Health Service employee for injuries resulting from the employee's performance of medical functions within the scope of his or her employment. The United States Supreme Court has held that "[t]he immunity provided by § 233(a) precludes *Bivens* actions against individual [Public Health Service] officers or employees for harms arising out of constitutional violations committed while acting within the scope of their office or employment." Hui v. Castaneda, 559 U.S. 799, 130 S.Ct. 1845, 1847, 176 L.Ed.2d 703 (2010)(stating that Section 233(a) "plainly precludes a *Bivens* action against petitioners by limiting recovery for harms arising from the conduct at issue to an FTCA action against the United States.") Defendant Lucas holds the position of the Health Services Administrator ["HSA"] at FCI

21

McDowell. Thus, Plaintiff alleges that Defendant Lucas is responsible for failing to ensure that he was provided appropriate medical care. Defendant Lucas was clearly acting within the scope of her employment when performing functions pertinent to her position, such as her administrative oversight and supervision of the Health Services Department. Plaintiff requests that this Court reject Defendant Lucas' Declaration because it "is false and submitted under fraud." The record, however, fails to support Plaintiff's conclusion that Defendant Lucas' Declaration "is false and submitted under fraud." The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (citing Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir.2001)). Based on the foregoing, the Court finds that Defendant Lucas was a Commissioned Officer in the United States Public Health Service during the time period relevant to this Complaint and has absolute immunity from suit for all claims arising from the medical care provided to Plaintiff. The Court, therefore, respectfully recommends that Defendant Lucas' "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" be granted. The undersigned finds it unnecessary to consider the other reasons which Defendant Lucas has submitted for dismissal.

**B.    Plaintiff's claims against Defendant Hogsten and Friss .**

In his Complaint, Plaintiff appears to contend that Defendants Hogsten and Friss violated his constitutional rights by failing to ensure that he received proper medical treatment. (Document No. 2.) Specifically, Plaintiff asserts that Defendant Hogsten "turned a blind eye to the neglect that was taking place with the denial of Plaintiff's medical treatment." (Id., p. 8.) Plaintiff claims that Defendant Friss "failed to get involved" and "acted with negligence and

omission by treating Plaintiff's medical condition in a careless manner." (Id., p. 9.)

In their Motion, Defendants Hogsten and Friss contend "[t]heir supervisory positions and the general notion that they are responsible for the actions of their subordinates are simply insufficient to form the basis of a claim for violations of a constitutional right, and they must be dismissed from this action.) (Document No. 27, pp. 16 - 17.) First, Defendants Hogsten and Friss argue that they "were not directly involved in the medical care of inmates at FCI McDowell." (Id., p. 16.) Defendants Hogsten and Friss explain that they "relied upon the judgment of medical staff to treat all inmates." (Id.) Next, Defendants Hogsten and Friss contend that "Plaintiff fails to show that Defendants Hogsten and Friss had direct involvement in any subordinate's allegedly unconstitutional actions." (Id., p. 17.) Finally, Defendants Hogsten and Friss argue that they should be dismissed because Plaintiff names them as a defendant based upon their previous supervisory positions as Warden and Associate Warden (Id.) Plaintiff failed to address the foregoing argument in his Response. (Document No. 45.)

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 129 S.Ct. at 1948("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Also see Monell v. Department of Social Services of the City of NY, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Liability, however, may attach to a supervisory official if "conduct directly causing the deprivation was done to effectuate an official policy or custom for which [the official] could be liable." Fisher v. Washington Metro. Area Transit Auth., 690 F.2d 1133, 1142-43 (4th Cir. 1982), *abrogated on other grounds by*

County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). Further, supervisory officials may be liable for acts of their subordinates where "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative fact in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984). Thus, the inquiry for the Court is whether the Defendants individually "acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm." Moore v. Winebrenner, 927 F.2d 1312, 1315 (4th Cir. 1991).

Defendants Hogsten and Friss argue that Plaintiff has failed to demonstrate how they were personally involved in violating any of Plaintiff's constitutional rights. Essentially, Plaintiff alleges that Defendants Hogsten and Friss violated his constitutional rights with respect to their failure to supervise employees and in responding to his administrative remedy. The evidence of record reveals that Defendant Hogsten responded to an administrative remedy request filed by Plaintiff.[4] (Document No. 2-1, p. 7.) The dismissal of a non-medical defendant is appropriate where the defendant's sole involvement is the denial of an administrative remedy request. See Fellove v. Heady, 2008 WL 196420 *4 (N.D.W.Va. Jan. 22, 2008)(stating that "to the extent that the plaintiff may be asserting that these defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is also without merit as this is not the type of personal involvement required to state Bivens claim"); Mabry v. Ramirez, 2007 WL 4190398 *6 (N.D.W.Va. Nov. 21, 2007)(holding that "denying a prisoner's institutional grievance is not the type of personal involvement required to state a Bivens claim for deliberate indifference to serious medical needs"); Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March 31, 2003), aff'd,

---

[4]   There is no indication that Defendant Friss responded to an administrative remedy.

70 Fed. Appx. 147 (4th Cir. 2003)(finding that the warden should be dismissed where the only claim against the warden concerned his dismissal of plaintiff's administrative remedy). In order to succeed on a medical claim against non-medical personnel, plaintiff must establish that non-medical personnel were personally involved in a denial of treatment, deliberately interfered with treatment, or tacitly authorized or were indifferent to a prison physician's conduct. Lewis v. Angelone, 926 F. Supp. 69, 73 (W.D.Va. 1996). Although the record indicates that Plaintiff sent an e-mail to Defendants Hogsten and Friss complaining of the alleged inadequate medical treatment, this is insignificant. (Document No. 2-1, pp. 24 and 26.) In Response to Plaintiff's e-mail, Defendant Hogsten stated that "I will forward your e-mail to Dr. Matos." (Id., p. 26.) In Response to Plaintiff's e-mail, Defendant Friss stated that "I am following up with the HSA." (Id., p. 24.) Non-medical prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Miltier v. Born, 896 F.2d 848, 854 - 55 (4th Cir. 1990). In Defendant Hogsten's Declaration, she states as follows:

> 3.     As the former Warden, I did not make medical decisions about the care of inmates. I relied upon my medical staff to make medical decisions regarding the type of medical care that was appropriate for inmates at FCI McDowell.

(Document No. 26-5.) In Defendant Friss' Declaration, he states as follows:

> 3.     As the former Warden, I did not make medical decisions about the care of inmates. I relied upon my medical staff to make medical decisions regarding the type of medical care that was appropriate for inmates at FCI McDowell.

(Document No. 26-6.) Thus, the undersigned finds there is no evidence that Defendants Hogsten and Friss were personally involved in a denial of treatment to Plaintiff, deliberately interfered with Plaintiff's treatment, or tacitly authorized the medical staffs' conduct. Accordingly, the

Court therefore finds that Defendants Hogsten and Friss' "Motion to Dismiss, or in the Alternative Motion for Summary Judgment" should be granted. The undersigned finds it unnecessary to consider the other reasons which Defendants Hogsten and Friss have submitted for dismissal.

### C.   No evidence of deliberate indifference.

Under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). See also Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), quoting Hudson v. Palmer, 468 U.S. 517, 526 - 27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). Sentenced prisoners are therefore constitutionally guaranteed adequate medical care under the Eighth Amendment.

To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege and prove (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297 - 99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious

deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (citing Rhodes v. Chapman, 452 U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(quoting Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). See also White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In Strickler, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") A medical need serious enough to give rise to an Eighth Amendment claim involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment causes continuous severe pain. The Fourth Circuit stated the applicable standard in Miltier v. Beorn, 896 F.2d 848, 851 - 852 (4th Cir. 1990), as follows:

> To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness. * * * Deliberate indifference may be demonstrated by either actual intent or reckless disregard. * * * A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. * * * Nevertheless, mere negligence or malpractice does not violate the eighth amendment. (Citations omitted)

See also Sosebee v. Murphy, 797 F.2d 179, 183 (4th Cir. 1986)(Facts indicating that guards were aware that inmate's condition had worsened and was life-threatening and intentionally ignored the situation and refused to seek medical assistance provided a reasonable basis for finding

deliberate indifference to inmate's medical needs.); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978), <u>cert. denied</u>, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980)(Pretrial detainee's allegations of delay in treatment of his broken arm indicated a reasonable basis for inferring deliberate indifference to his serious medical needs.); <u>Russell v. Sheffer</u>, 528 F.2d 318 (4th Cir. 1975)(Summary judgment for defendants affirmed where claim that inmate received constitutionally inadequate medical treatment involved a question of medical judgment not subject to judicial review.) Therefore, Plaintiff must first allege and eventually establish a "sufficiently serious" deprivation of adequate medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim. Second, to establish the subjective component of deliberate indifference, Plaintiff must allege and prove each defendant's consciousness of the risk of harm to him. <u>See</u> <u>Farmer</u>, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, Plaintiff must establish that each Defendant "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. Plaintiff in this case must therefore allege and establish that each Defendant was aware that he was receiving constitutionally inadequate medical care and disregarded the serious physical consequences.

Plaintiff alleges that Defendants Goode, Stark, and Matos acted with deliberate indifference in diagnosing and providing treatment for his H. pylori. For purposes of an Eighth Amendment claim, a medical need is serious if it involves a condition which places an inmate at substantial risk of serious harm, usually loss of life or permanent disability, or a condition for

which lack of treatment causes continuous severe pain. Plaintiff alleges that his condition caused continuous pain and suffering. Accordingly, the undersigned will assume for purposes of this motion that Plaintiff's H. pylori infection was serious enough to give rise to an Eighth Amendment claim.

Next, the undersigned will consider whether Defendants Goode, Stark, and Matos acted with deliberate indifference to Plaintiff's health and safety under a subjective standard. To satisfy the subjective component, Plaintiff must allege each Defendant's consciousness of the risk of harm to him. See Farmer, supra, 511 U.S. at 840, 114 S.Ct. at 1980. Plaintiff contends that Defendants acted with deliberate indifference in failing to timely diagnosis and treat his H. pylori infection. Plaintiff first notified Health Services of his "recurrent left side chest pain" on February 7, 2012. (Document No. 26-2, pp. 32 - 34.) PA Hill ordered lab tests and an EKG. (Id., pp. 33 - 34.) The EKG was conducted on February 22, 2012, and revealed normal results except for rate. (Document No. 26-3, p. 8.) Approximately two weeks later, Plaintiff reported to Health Services complaining of "right abdominal flank pain." (Document No. 26-2, pp. 29 - 31.) PA Hill evaluated Plaintiff and ordered abdominal x-rays. (Id., p. 30.) An abdominal x-ray was conducted on March 15, 2012, and revealed negative results except possible constipation without no evidence of an obstruction. (Document No. 26-3, p. 10.) Approximately two weeks later, Plaintiff reported to Health Services complaining of recurrent chest pain when working out and playing handball. (Document No. 26-2, pp. 19 - 21.) PA Hill examined Plaintiff noting that Plaintiff's heart had a regular rhythm and his symptoms were consistent with muscle strain. (Id., p. 21.) PA Hill ordered lab tests, which revealed normal results. (Id., pp. 67 and 101.) On August 28, 2012, Plaintiff failed to report for his sick call visit concerning his complaints of continually

feeling faint, having chest pain, head pain, blurred vision, discomfort in urine flow. (Id., pp. 13 - 14.)

On October 18, 2012, Plaintiff reported to sick call complaining of feeling faint, blurred vision, and chest pain. (Id., pp. 7 - 10.) Plaintiff was evaluated by MLP Panaguiton, who noted that Plaintiff's heart was bradycardic with skipped beats. (Id., pp. 9 - 10.) MLP Panaguiton ordered lab testing, including a blood test for H. pylori, and an EKG. (Id.) Lab testing preformed on October 31, 2012, revealed negative results for H. pylori. (Id., pp. 86 - 88.) The EKG was performed on November 1, 2012, and revealed normal results except for rate. (Id., pp. 6 and 90.) Although Defendant Mato's requested referral to a cardiologist, the Utilization Review Committed denied his request on January 25, 2013. (Document No. 26-3, p. 69.) Plaintiff failed to show for sick call appointments on February 8, 2013, March 14, 2013, April 4, 2013, May 14, 2013, and June 6, 2013, regarding his complaints of chest pain. (Id., pp. 34 - 40.)

On July 22, 2013, Plaintiff reported to Health Services complaining of chest pain without shortness of breath. (Id., pp. 30 - 32.) MLP Panaguiton evaluated Plaintiff, issued him a medical idle, and scheduled a follow-up appointment with Defendant Mato. (Id., p. 31.) The next day, on July 23, 2013, Plaintiff was evaluated by Defendant Matos. (Id., pp. 27 - 29.) Defendant Matos ordered a chest x-ray and EKG, both of which revealed normal results. (Id., pp. 58 and 62.) Approximately one week later, Plaintiff presented to sick call complaining of an ear ache, epigastric pain, and bloating with diarrhea for three days. (Id., p. 24.) Defendant Goode examined Plaintiff and diagnosed him with acid reflux and an acute ear infection. (Id., p. 25.) Defendant Goode prescribed Amoxicillin as treatment for Plaintiff's ear infection and instructed Plaintiff to purchase over-the-counter omeprazole for his acid reflux. (Id., pp. 25 - 26.) On

December 26, 2013, Plaintiff reported to sick call complaining of chest pain associated shortness of breath, frontal headaches, low grade fevers, and blurred vision. (Id., p. 113.) Plaintiff was evaluated by Defendant Stark, who ordered lab work and an EKG. (Id., p. 116.) Plaintiff's lab tests and EKG were conducted on January 8, 2014, with the lab tests revealing that he was positive for H. pylori and the EKG revealing normal results. (Document No. 26-4, pp. 8, 32, 35 - 36.) Approximately one month later, on February 7, 2014, Plaintiff reported to Health Services where his lab results were discussed with him. (Document No. 26-3, pp. 110 - 112.) Defendant Stark prescribed a 14-day regimen of medication to treat H. pylori and explained the importance of completing the full 14-day course. (Id.) Defendant Stark again educated Plaintiff on a proper diet and instructed him to purchase Zantac or Omeprzole from the commissary. (Id.)

On March 21, 2014, Plaintiff reported to sick call complaining of abdominal pain and upset stomach most bothersome right after eating. (Id., pp. 107 - 109.) Plaintiff was examined by Defendant Stark, who scheduled Plaintiff for a follow-up urea breath test for H. pylori. (Id., p. 107 - 109.) Defendant Stark explained to Plaintiff the cause of H. pylori, advised him to wash his hands frequently before meals, emphasized the importance of dietary changes, and advised him to avoid ibuprofen. (Id.) Less than a week later, on March 27, 2014, Plaintiff returned to sick call complaining of stomach pain. (Id., p. 104.) RN Dufour examined Plaintiff noting normal bowel sounds, instructed Plaintiff to purchase Zantac or Prilosec as previously ordered by Defendant Stark, and again educated Plaintiff on dietary changes. (Id.) Approximately four days later, Plaintiff reported to sick call complaining of his stomach burning and stating that the over-the-counter medication had not helped his condition. (Document No. 101 - 102.) RN Goan, however, noted that Plaintiff's commissary purchase report indicated that Plaintiff had not

purchased the over-the-counter medication. (Id.) Plaintiff was given another medical commissary slip to purchase Zantac. (Id.) By Administrative Note entered on April 2, 2014, Defendant Stark indicated that "inmate has not purchased Zantac or Prilosec from commissary as of today." (Id., p. 100.)

On May 1, 2014, Plaintiff reported to sick call again complaining of abdominal and stomach pain. (Id., pp. 98 - 99.) Defendant Stark noted that Plaintiff's commissary purchases revealed that he was not obeying dietary restrictions. (Id.) Defendant Stark again educated Plaintiff on proper food choices and instructed Plaintiff to purchase the over-the-counter medication. (Id.) Plaintiff, however, stated that "he would not purchase anything from the commissary to treat something 'we' gave him. (Id.) Two days later, Plaintiff reported to sick call complaining of nausea, bloody stool, abdominal pain, and chest pain. (Id., pp. 95 - 97.) Plaintiff was examined by Defendant Stark, who ordered lab tests and an EKG. (Id.) Plaintiff was also given Hemoccult cards to check for blood in his stool. (Id., p. 96) The EKG was performed that day and revealed normal results. (Id. and Document No. 26-4, p. 25.) Defendant Stark again emphasized the importance of dietary changes and instructed Plaintiff to purchase over-the-counter acid reflux medication from the commissary. (Id.) On June 17, 2014, Plaintiff reported to Health Service for a follow-up concerning his complaints of heartburn, abdominal pain, and nausea. (Document No. 26-3, pp.  92 - 93.) Defendant Stark noted that all of Plaintiff's Hemoccult cards were negative for blood and the two separate QuickVue H. pylori gll tests were negative. (Id. and Document No. 26-4, p. 11.) Defendant Stark noted that Plaintiff had not purchased Zantac from the commissary, again instructed him to purchase the medication, and educated him on proper food choices. (Id.)

On July 21, 2014, Plaintiff reported to sick call complaining of being lightheaded, dizzy, nausea, abdominal pain, and chest pain. (Id., pp. 90 - 92.) Defendant Stark examined Plaintiff, explained the importance of eating at least three meals a day, and instructed him to avoid irritating foods. (Id.) Defendant Stark again reviewed Plaintiff's recent commissary purchases, which revealed that Plaintiff was not obeying dietary restrictions. (Id.) On September 12, 2014, Plaintiff reported to Health Services complaining of continued abdominal and chest pain. (Id., pp. 85 - 88.) Defendant Goode examined Plaintiff and reviewed his commissary report noting the continued purchase of restricted foods. (Id.) Defendant Goode instructed Plaintiff on proper food choices and prepared a consultation request for a referral to a gastroenterologist. (Id.) On the same day, Dr. Gomez denied Defendant Goode's request for a referral noting Plaintiff's unhealthy food choices. (Id., p. 84.) On October 3, 2014, Plaintiff was a "no show" for his sick call appointment concerning his complaint of chest pain, stomach pain, and abdominal pain. (Id., p. 83.) On October 23, 2014, Plaintiff reported to Health Services for complaints of chest and abdominal pain. (Id., pp. 78 - 81.) Lab work, an EKG, a chest x-ray, and an abdominal x-ray were performed on the same day. (Id.) All tests showed normal results. (Document No. 26-4, pp. 19, 21, and 23.) Approximately one week later, Plaintiff again reported to Health Service concerning his complaint of chronic left upper abdominal and left side pain. (Id., pp. 74 - 77.) Defendant Goode ordered lab tests and educated Plaintiff on his diet. (Id., p. 77.) On December 30, 2014, Plaintiff reported to sick call complaining of abdominal pain, nausea, dizziness, and chest pain. (Document No. 26-4, pp. 52 - 54.) Plaintiff was examined by Defendant Stark, who noted that a review of Plaintiff's commissary purchases revealed that he was not obeying dietary restrictions. (Id., p. 54.) Two EKGs were performed, which revealed normal results. (Id., pp. 75 -

33

76.) On January 22, 2015, Plaintiff was a "no show" for his sick call visit regarding his complaint of "feeling sick." (Id., p. 51.) On March 10, 2015, Plaintiff reported to sick call complaining of left lower side abdominal pain, nausea, and vomiting. (Id., pp. 45 - .) Defendant Stark ordered lab tests, a H. pylori stool test, and abdominal x-rays. (Id., pp. 46 - 47.) Approximately one week later, Plaintiff's H. pylori stool test was conducted and revealed negative results. (Id., p. 70.)

The Court finds that Defendants Goode, Stark, and Matos did not act with deliberate indifference in providing medical treatment regarding Plaintiff's H. pylori. The record reveals that Defendants evaluated Plaintiff and provided treatment following each sick-call request. Defendants consistently evaluated Plaintiff's condition, ordered chest and abdominal x-rays, conducted EKGs, ordered lab tests, submitted consult requests, and prescribed medications. First, Plaintiff contends that Defendants acted with deliberate indifference because his H. pylori infection went undiagnosed for nearly a year. Specifically, Plaintiff alleges that he initially suffered chest pain due to H. pylori on February 8, 2013, and his condition remained un-diagnosed until January 8, 2014. The record, however, does not support Plaintiff's conclusion that he had H. pylori on February 8, 2013. Plaintiff's medical records reveal that although he had presented to Health Services with prior complains of chest and abdominal pain, he tested negative for H. pylori on October 31, 2012. Further, Plaintiff's medical records do no support his claim that he sought treatment numerous times in 2013, but he "was constantly turned away." The record reveals that on five occasions in 2013, Plaintiff was either a "no show" for his sick-call appointment or refused to wait to be seen by medical staff. Second, Plaintiff argues that Defendant Stark acted with deliberate difference because she waited nearly a month to notify

him of his positive test result for H. pylori and provide treatment for the condition. The record reveals that Plaintiff tested positive for H. pylori on January 8, 2014, and Defendant Stark failed to notify or provide treatment until February 7, 2014. There is no evidence, however, that Defendants knowingly disregarded Plaintiff's positive test result and failed to provide treatment. At most, Defendants may have been negligent in failing to discover the positive test result and provide treatment sooner. It is well recognized that "negligent medical diagnoses or treatment, without more, do not constitute deliberate indifference." Webb v. Hamidullah, 281 Fed.Appx. 159, 166 (4th Cir. 2008); also see Sosebee v. Murphy, 797 F.2d 179, 181 (4th Cir. 1986)("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). Third, Plaintiff argues that Defendant Goode improperly attempted to treat his H. pylori with Amoxicillin. Plaintiff's medical records, however, clearly show that Defendant Goode prescribed Amoxicillin to treat Plaintiff's ear inflection – not his stomach complaints.

The undersigned, therefore, finds no evidence that Defendants or medical staff at FCI McDowell knowingly disregarded Plaintiff's need for treatment of his H. pylori infection. Further, the record does not support Plaintiff's conclusion that Defendants acted with deliberate indifference by failing to conduct further testing and failing to refer him to a specialist. The record reveals that Defendants made sufficient efforts to diagnose and treat Plaintiff's condition. The record, further, reveals that Plaintiff refused to abide by dietary restrictions and take over-the-counter acid reflux as directed. Plaintiff appears to simply disagree with the appropriate course of treatment. An inmate's disagreement with his medical care or the course of treatment for an objectively serious medical injury generally will not constitute a sufficient basis for a

constitutional claim. <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). "[T]he Fourth Circuit has observed that an inmate's treatment may be limited to what is medically necessary as opposed to 'that which may be considered merely desirable' to the inmate." <u>Malcomb v. Raja</u>, 2010 WL 3812354, at * 1 - 2 (S.D.W.Va. Sept. 22, 2010)(quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 47-48 (4th Cir. 1977)(finding that plaintiff was provided medication for his pain and "Defendants' decision to provide plaintiff with one medication over another does not give rise to a constitutional violation.") Accordingly, the undersigned finds that Defendants Goode, Stark, and Matos did not act with deliberate indifference in providing medical treatment for Plaintiff's condition. The undersigned finds it unnecessary to consider the other reasons which the Defendants have submitted for dismissal.

**2.      FTCA Claim:**

An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." <u>United States v. Muniz</u>, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

The FTCA, however, does not create a new cause of action. <u>Medina v. United States</u>, 259 F.3d 220, 223 (4th Cir. 2001). The statute merely "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." <u>Id.</u>

In the present case, Plaintiff alleges that Defendants' negligent acts occurred in the State

of West Virginia. Accordingly, West Virginia State law applies. Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6.[5] Compliance with West Virginia Code § 55-7B-6 is mandatory prior to filing suit in federal court. <u>Stanley v. United States</u>, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); <u>also</u> <u>see</u> <u>Starns v. United States</u>, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap applies to claims brought against the United

---

[5]  West Virginia Code § 55-7B-6 provides the following in pertinent part:

> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying the provisions of this section.

> (b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of Rule 15 of the Rules of Civil Procedure.

States under the FTCA). West Virginia Code § 55-7B-6(c), however, provides that no screening certificate of merit is necessary where "the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care."

Plaintiff alleges that Defendants acted with negligence in diagnosing and providing medical treatment for his H. pylori. In its Motion to Dismiss, the United States contends that Plaintiff's claim should be dismissed because he failed to timely and properly file a screening certificate of merit pursuant to the MPLA. (Document No. 27, pp. 18 - 22.) In Response, Plaintiff first argues that he should be not be required to file a screening certificate of merit. (Document No. 45, pp. 11 - 13.) Citing Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), Plaintiff appears to claim that his SF-95 form provided sufficient notice of intent to meet the MPLA requirements. (Id.)  Plaintiff further asserts that "both the jurors and federal courts in this jurisdiction have 'common knowledge and experience' of the treatment and diagnosis of H. pylori." (Id.)

Under West Virginia law, "[i]t is the general rule that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, Roberts v. Gale, 149 W.Va. 166, 139 S.Ed.2d 272 (1964). Expert testimony, however, is not required "where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience." Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739 (2006). The MPLA provides as follows concerning claims "based upon a well-established legal theory of liability":

Notwithstanding any provision of this code, if a claimant or his or her counsel,

38

> believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

West Virginia Code § 55-7B-6(c). In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858.

Unlike the facts in Johnson, Plaintiff's allegations of negligence are complex and expert testimony is necessary. See O'Neil v. United States, 2008 WL 906470 (S.D.W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); also see Giambalvo v. United States, 2012 WL 984277 * 4 (N.D.W.Va. March 22, 2012)(finding that Johnson "is a rare exception to 'the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses.'"). In the instant case, it appears that Defendants examined Plaintiff, ordered x-rays, EKGs, and lab tests, and provided medication. Plaintiff, however, contends that Defendants failed to conduct timely and appropriate diagnostic testing and treatment for his complaints of

39

chest and abdominal pain. Expert testimony is necessary to support a finding that the medical testing and treatment provided by Defendants fell below the applicable standard of care. Plaintiff's medical records reveal that Plaintiff suffered from a H. pylori infection. The undersigned finds that what constitutes appropriate diagnostic testing, timely treatment, risk factors, symptoms, and appropriate treatment options for a H. pylori infection are not within the understanding of lay jurors by resort to common knowledge and experience. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55-7B-6(c). The undersigned, therefore, recommends that the United States' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" be granted. The undersigned finds it unnecessary to consider the other reasons which the United States has submitted for dismissal.

**3.**     **Motion for Temporary Restraining Order and a Preliminary Injunction:**

Rule 65(b) of the Federal Rules of Civil Procedure sets forth the limited circumstances under which a temporary restraining order can be granted as follows:

> A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

The Fourth Circuit explained the different functions of temporary restraining orders and preliminary injunctions in Hoechst Diafoil Company v. Nan Ya Plastics Corporation, 174 F.3d 411, 422 (4th Cir. 1999), as follows:

> While a preliminary injunction preserves the status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo

> only until a preliminary injunction hearing can be held: '[U]nder federal law [temporary restraining orders] should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer.' Granny Goose, 415 U.S. at 439.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).

Plaintiff first requests that this Court enter an order transferring him to a prison facility. The classification and transfer of federal prisoners falls within the broad discretion of the Bureau of Prisons and a Courts lack authority to order that a prisoner be confined to any particular institution. See 18 U.S.C. § 3621(b)(the BOP shall designate the place of an inmate's confinement); also see Meachum v. Farno, 427 U.S. 215, 225, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976)(the transfer of a convicted and sentenced inmate is within the sound discretion of the BOP); United States v. Williams, 65 F.3d 301, 307 (2nd Cir. 1995)("A sentencing court has no authority to order that a convicted defendant be confined in a particular facility, much less placed in a particular treatment program; those decisions are within the sole discretion of the Bureau of Prisons."); Hinton v. Federal Bureau of Prisons, 2009 WL 3347158, * 4 n. 5 (S.D.W.Va. Oct. 14, 2009)("Inmates . . . have no constitutional right to be housed in any particular prison or jail, regardless of security classification."). Second, Plaintiff requests that "the Defendants be ordered to return the [water] fountains or provide bottled water each meal at the institution." The record, however, contains no evidence that Plaintiff contradict H. pylori from the water at FCI McDowell. Thus, Plaintiff cannot establish that he is likely to succeed on the merits of such a

claim, or that he is likely to suffer irreparable harm. Finally, the undersigned has recommended that Plaintiff's Complaint be dismissed as to all Defendants. The undersigned, therefore, finds that Plaintiff's request for injunctive relief should be denied as he cannot establish that he is likely to succeed on the merits.[6]

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **GRANT** the Defendants' "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment (Document No. 26), **DENY** Plaintiff's "Motion for Restraining Order Against Medical Staff" (Document Nos. 36 and 37) and "Motion for Temporary Restraining Order or Preliminary Injunction" (Document No. 43), and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge David A. Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have seventeen (17) days (fourteen days, filing of objections and three days, mailing/service) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

---

[6]   To the extent Plaintiff wishes to allege that his due process rights were violated during the disciplinary proceedings, Plaintiff should file a Section 2241 Petition.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Faber and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: January 15, 2016.

Omar J. Aboulhosn
United States Magistrate Judge